UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMIE SANCHEZ,

        Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

        Defendant.

Case No. 08-cv-1542-RAJ-JPD

REPORT AND RECOMMENDATION

## I. INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff Jamie Sanchez appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") which found Plaintiff no longer disabled as of May 1, 2005, after a hearing before an administrative law judge ("ALJ"). For the reasons set forth below, the Court recommends that the Commissioner's decision be AFFIRMED.

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff is a 48-year old woman with a GED education. Administrative Record ("AR") at 78, 723. Her past work experience includes employment as a coffee shop owner/worker, waitress, cashier, frozen fish packer, cleaner and caregiver. AR at 197-204, 723-25. A fraud

REPORT AND RECOMMENDATION
PAGE - 1

investigation revealed that Plaintiff was working at her family's coffee shop until at least 2005. AR at 167-186, 723-25.

On June 25, 1997, an ALJ found that Plaintiff had been disabled since August 7, 1995 due to bipolar disorder, degenerative changes of the lower back and a herniated disc, post-surgery. AR at 49, 168. The ALJ found that Plaintiff's bipolar disorder met listing 12.04. *Id.*

On September 28, 2001, the Division of Disability Determination Services performed a continuing disability review and ceased Plaintiff's benefits as of December 30, 2001. AR at 168. However, the decision to cease benefits was reversed on July 11, 2002, and Plaintiff was allowed to continue her disability benefits for affective disorder and personality disorder. *Id.*

On November 22, 2004, the Cooperative Disability Investigations Unit received a fraud report concerning Plaintiff. *Id.* The report indicated that Plaintiff and her family operated an espresso stand in Sedro-Woolley and that Plaintiff had told several individuals that her family regularly vacationed at a home they owned in Mexico. *Id.* A fraud investigation ensued, which included surveillance of Plaintiff working at the espresso stand, and agents for the Office of the Inspector General prepared a written report dated April 11, 2005. AR at 167-176. Based on the Inspector General's report and further review of the record, a disability adjudicator determined that Plaintiff's disability benefits should be terminated. AR at 177-186. On May 27, 2005, Plaintiff was notified by the Commissioner that her benefits would be ending because she was considered no longer disabled as of May 1, 2005. AR at 24, 59-61. After a hearing on reconsideration, the determination that Plaintiff was no longer disabled was upheld in a written decision dated January 5, 2006. AR at 62-75.

Plaintiff requested a hearing before an ALJ, which took place on January 7, 2008. AR at 718-740. Plaintiff was represented by an attorney at the hearing. *Id.* On April 7, 2008, the ALJ issued a decision finding Plaintiff no longer disabled as of May 1, 2005. AR at 13-20.

On August 19, 2008, Plaintiff's administrative appeal of the ALJ's decision was denied by the Appeals Council, AR at 5, making the ALJ's ruling the "final decision" of the

Commissioner as that term is defined by 42 U.S.C. § 405(g). On October 29, 2008, Plaintiff timely filed the present action challenging the Commissioner's decision. Dkt. No. 3.

### III. JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits when the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 201 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id*.

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id*. at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## V. EVALUATING DISABILITY

As the claimant, Plaintiff bears the burden of proving that she is disabled within the meaning of the Social Security Act (the "Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled under the Act only if her impairments are of such severity that she is unable to do her previous work, and cannot, considering her age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a seven step sequential evaluation process for determining whether a claimant continues to be disabled. 20 C.F.R. § 416.994(b)(5). Step one asks whether the claimant has an impairment or combination of impairments which meets or medically equals the severity of a listed impairment. 20 C.F.R. § 416.994(b)(5)(i). If so, her disability will be found to continue. If not, the Commissioner moves to step two. At step two, the ALJ must determine whether medical improvement has occurred. 20 C.F.R. § 416.994(b)(5)(ii). Medical improvement is defined as any decrease in the medical severity of the claimant's impairment or combination of impairments which was present at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled. 20 C.F.R. § 416.994(b)(1)(i). A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs and/or laboratory findings associated with the claimant's impairment. *Id.* If medical improvement has occurred, the analysis proceeds to step three. If not, the analysis moves to step four. At step three, the ALJ must determine whether the medical improvement is related to the claimant's ability to

work. 20 C.F.R. § 416.994(b)(5)(iii). Medical improvement is related to the claimant's ability to work if there has been an increase in the capacity to do basic work activities based on the impairment that was present at the time of the most recent favorable medical determination. *Id.* If medical improvement is not related to the claimant's ability to work, the Commissioner proceeds to step four. Conversely, if medical improvement is related to the claimant's ability to work, the Commissioner moves to step five. At step four, the ALJ must determine whether an exception applies. 20 C.F.R. § 416.994(b)(5)(iv). If no exception applies, the claimant's disability continues. If an exception from the first group of exceptions applies, the analysis proceeds to step five. If an exception from the second group of exceptions applies, disability benefits will end. At step five, the ALJ must determine whether all the claimant's current impairments in combination are severe. 20 C.F.R. § 416.994(b)(5)(v). If all of the claimant's current impairments in combination do not significantly limit her ability to do basic work activities, the impairments will not be considered severe and disability benefits will be denied. *Id.* If the current impairments in combination do significantly limit the claimant's ability to do basic work activities, the Commissioner moves to step six. At step six, the ALJ must assess the claimant's residual functioning capacity based on her current impairments and determine if the claimant can perform past relevant work. 20 C.F.R. § 416.994(b)(5)(vi). If so, disability benefits will end. If not, the analysis proceeds to the last step. At step seven, the ALJ must determine whether other work exists that the claimant can perform, given her residual functioning capacity and considering her age, education and past work experience. 20 C.F.R. § 416.994(b)(5)(vii). If such work exists, the clamant is no longer considered disabled and disability benefits will end. If such work does not exist, disability will be found to continue and benefits will continue.

## VI. DECISION BELOW

On April 7, 2008, the ALJ issued a decision finding the following:

1. The most recent favorable medical decision finding that the claimant continued to be disabled is the determination dated July 11, 2002. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairments: back impairment, degenerative disk disease and bipolar disorder. The claimant's bipolar disorder met the listing(s) 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1.

3. The medical evidence establishes that the claimant did not develop any additional impairments after the CPD through May 1, 2005.

4. Since May 1, 2005, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Medical improvement occurred as of May 1, 2005.

6. The medical improvement is related to the ability to work because, as of May 1, 2005, the claimant no longer had an impairment or combination of impairments that met or medically equaled the same listing(s) that was met at the time of the CPD.

7. Beginning on May 1, 2005, the claimant's impairments in combination has not caused more than a minimal impact on the claimant's ability to perform basic work activities.

8. The claimant's disability ended May 1, 2005, and the claimant has not become disabled again since that date.

AR at 14-20.

## VII. ISSUES ON APPEAL

The principal issues on appeal are:

1. Whether the ALJ failed to properly develop the record.

2. Whether the ALJ erred by not considering Plaintiff's migraine headaches.

3. Whether the ALJ erred by not considering certain lay witness evidence.

Dkt. No. 17 at 10-14; 18 at 5.

## VIII. DISCUSSION

### A. The ALJ Did Not Fail to Properly Develop the Record.

"[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). This duty exists even when, as here, the claimant is represented by counsel. *Id.* "The ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005).

Plaintiff contends that the ALJ failed to properly develop the record because "no enquiry was made into exactly how many hours Plaintiff actually worked per week, or how many hours her husband worked." Dkt. No. 17 at 11. Plaintiff also asserts that her husband should have been called to testify or asked to write a letter on her behalf because he "would have been in an excellent position to testify about how many hours Plaintiff worked at the coffee shop and the amount and kinds of work performed by Plaintiff while at the shop." *Id.* In addition, Plaintiff asserts that the ALJ should have determined if Plaintiff's work at the coffee shop amounted to "substantial gainful activity" by reviewing the tax records that she submitted to the Internal Revenue Service. Dkt. No. 17 at 12.

The ALJ did not fail to properly develop the record because there was no ambiguity with respect to the relevant medical evidence and the results of the fraud investigation, both of which support the ALJ's conclusion that Plaintiff was no longer disabled as of May 1, 2005. For example, Thomas Clifford, Ph.D., performed a psychiatric review technique in May 2005 and determined that Plaintiff has no severe impairments, is mentally appropriate and has not had any mental breakdowns. AR at 572. Dr. Clifford also found that Plaintiff "has demonstrated that she can be a successful business woman," cares for her several children and travels to her vacation home in Mexico frequently. *Id.* Dr. Clifford also found that Plaintiff is

"not a credible source of information" and that "fraud or similar fault" exists. *Id.* Guthrie Turner, M.D., performed a physical examination of Plaintiff in May 2005 and determined that Plaintiff can: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for six hours; sit for six hours; and push and pull without limitation. AR at 435-442. Dr. Turner did not find any postural, manipulative, visual, communicative or environmental limitations. *Id.* Dr. Turner also noted that Plaintiff was not credible, and noted that her recent medical records indicate that she operates her own coffee shop, attends Curves (a fitness center), and travels frequently to Mexico. *Id.*

Further, additional medical records from the relevant time period indicate that Plaintiff: "works at Coffee Caboose," AR at 331; "runs her own coffee stand in Sedro Woolley," AR at 557; was "leaving tomorrow for Mexico probably for a month," AR at 532; "is having to work on her feet a good 8 hours, sometimes up to 12 hours a day," AR at 530; "had joined [C]urves in Sedro-Woolley and was enjoying it," AR at 530; "[a]ttends Curves, goes three days a week," AR at 529; "claims to be very active at work," AR at 529; "exercise[s] to her capacity, walks on her treadmill every day, has a very active lifestyle otherwise," AR at 526; "is leaving for Mexico," AR at 519; and was "much more physically active [in Mexico], and has lost 8 lbs.," AR at 507. It is worth noting that when Plaintiff was asked by a psychologist what she was good at, she provided a one-word answer stating that she could "lie." AR at 619.

In addition to the medical record, the fraud investigation revealed that Plaintiff indeed owned and operated a coffee shop in Sedro-Woolley during the relevant period. AR at 167-176. In fact, Plaintiff's purchase and renovation of the coffee shop was documented in an article in the local newspaper. AR at 166. Surveillance of Plaintiff showed her working at the coffee shop, having full range of movement and movement without hesitation. *Id.* Plaintiff also communicated normally to customers and gave no indication of health problems. *Id.* Several other witnesses also stated that Plaintiff did not exhibit any physical limitations and communicated normally. *Id.* Witnesses also stated that Plaintiff worked at the coffee shop

nearly every day. *Id.* A former employee stated that Plaintiff reports only about half of what the business earns, and "fixes the books" so that it appears that the business earns very little money. *Id.* The fraud investigation also revealed that Plaintiff had a prior felony conviction for forgery, in which she pled guilty and was sentenced to 90 days in jail. *Id.* Plaintiff also had two other misdemeanor convictions. *Id.* In sum, in view of the unambiguous relevant medical evidence and the results of the fraud investigation, the Court concludes that the ALJ was capable of rendering a proper decision without developing the record further.

While Plaintiff asserts that the ALJ should have inquired as to "exactly how many hours Plaintiff actually worked" at the coffee shop, such an inquiry was unnecessary because Plaintiff testified that she "wasn't really working there," and that most of the time she was just sitting there or watching television. AR at 723-25. Therefore, because Plaintiff's contention was that she was not really working at the coffee shop when she was there, her testimony concerning the exact number of hours she worked there was not needed. Moreover, given the ALJ properly found Plaintiff lacked credibility, her testimony concerning "exactly how many hours" she worked at the coffee shop would be entitled to little weight. In any case, four witnesses, including two former employees, stated that Plaintiff worked there nearly every day. AR at 172-73. Plaintiff also told one of her health care providers in May 2004 that she worked at the coffee shop eight to twelve hours per day. AR at 530. Regarding how many hours Plaintiff's husband worked, that is irrelevant because he is not the claimant in this matter. Nonetheless, three witnesses in the fraud investigation, including a former employee, stated that Plaintiff's husband did not work at the coffee shop. AR at 172-73.

Plaintiff also asserts that her husband should have been called to testify or asked to write a letter on her behalf because he "would have been in an excellent position to testify about how many hours Plaintiff worked at the coffee shop and the amount and kinds of work performed by Plaintiff while at the shop." Dkt. No. 17 at 11. However, he already testified on her behalf at the disability hearing on reconsideration; he acknowledged that Plaintiff worked

at the coffee shop but that "she mostly needed help with telling her what to do," and that he or someone else was usually at her side. AR at 71. Plaintiff does not make clear what more her husband could have added at the administrative hearing before the ALJ, or how it would have made a difference. In any case, if Plaintiff and/or her counsel believed her husband's testimony was important, they could have called him to testify at the ALJ hearing or asked him to write a letter on her behalf. Plaintiff was given notice that she could "bring people to testify for you." AR at 63. Certainly Plaintiff was in a better position than the ALJ to determine whether her husband had something important to add at the hearing.

With respect to Plaintiff's tax records, the ALJ already had sufficient evidence to make a determination that Plaintiff was no longer disabled as of May 1, 2005. There was no ambiguity in the record that would give the ALJ cause to seek additional documentary evidence such as tax records. Also, Plaintiff already testified that she did not really work at the coffee shop and that the business made "zero income." AR at 723-25. Therefore, it is not clear what the tax records, which were presumably prepared by Plaintiff, would add to the administrative record. Also, a former employee stated in the fraud investigation that Plaintiff "fixes the books" so that it appears that the business earns very little money. AR at 173. Accordingly, any tax records would be of dubious value. Lastly, if Plaintiff and/or her counsel believed her tax records would have been helpful, they could have submitted them to the ALJ. Plaintiff was provided notice that she could "give the ALJ new evidence" at the hearing. AR at 63.

B. The ALJ Did Not Err by Not Considering Plaintiff's Migraine Headaches.

Plaintiff alleges that the ALJ erred by not considering her migraine headaches. However, while there is evidence in the record that Plaintiff sought treatment for headaches intermittently from 2001 to 2007, there is no evidence in the record indicating that Plaintiff's intermittent headaches would have any affect on her ability to perform basic work activities. Indeed, Plaintiff worked at her family's coffee shop during this time period. Moreover,

Plaintiff notified a doctor in March 2004 that she experienced a migraine only about once per month, AR at 473, and she testified at the administrative hearing that she does not get migraines as often "in the last couple years," AR at 728. While Plaintiff testified at the administrative hearing that she currently experienced a migraine two to three times a month, this testimony is called into doubt given the ALJ properly found Plaintiff lacked credibility and the fact that she also testified that she was at the hospital with a migraine "almost every single day" when she was working at the coffee shop, which is flatly refuted by the medical record.

In addition, the medical record strongly suggests that Plaintiff's emergency room visits for alleged migraines was really narcotic seeking behavior. Plaintiff notified the doctors that treated her in the emergency room that she was allergic to several standard pain medications such as Vicodin and codeine, and, accordingly, she was nearly always treated with narcotics such as morphine, Percocet, Dilaudid and Demerol. One doctor noted her alleged drug allergies and stated, "interestingly the patient tolerates morphine and Percocet." AR at 344. Plaintiff testified at the administrative hearing that her migraines were always treated with morphine. AR at 729-30. At least three doctors believed that Plaintiff's headaches were not migraines but probably narcotic rebound headaches. AR at 311, 452, 464. In fact, one doctor told Plaintiff he would have "increased difficulty" continuing to prescribe her narcotics (*e.g.*, morphine) on her emergency room visits. AR at 464. As far back as 2001, a doctor noted that Plaintiff was frequently appearing in emergency rooms trying to obtain narcotic analgesics. AR at 237. Plaintiff has a history of drug addition, admitting at one point that she used cocaine on a daily basis until approximately 2001. AR at 234, 610. In view of all of the foregoing, the Court concludes that the ALJ did not err by not considering Plaintiff's migraine headaches.

C. <u>The ALJ's Failure to Consider the Lay Witness Evidence was Harmless Error</u>.

Plaintiff contends that the ALJ erred by disregarding letters from two lay witnesses. Dkt. No. 17 at 14. The first letter, which is undated, is from Jean Swett, who asserts she is Plaintiff's "professional caregiver." AR at 215. The second letter, which is also undated, is

REPORT AND RECOMMENDATION
PAGE - 11

from Maxine Almojueda, who has been a friend of Plaintiff for six years. AR at 216. The ALJ's decision did not give specific reasons for disregarding the two lay witness statements. *See* AR at 13-20.

If an ALJ wishes to discount the testimony of a lay witness, he must provide reasons germane to each witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). An ALJ may reject lay witness statements if they are inconsistent with the record as a whole, or are inconsistent with the medical evidence. *Lewis v. Apfel*, 236 F.3d 503, 511-12 (9th Cir. 2001). Here, while the ALJ failed to give specific reasons for according no weight to the statements of Ms. Swett and Ms. Almojueda, the error is harmless. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be revered for errors that are harmless."). As an initial matter, the letters are undated so it is unclear to which time period they apply, which, in a case concerning medical improvement, is particularly important. In any event, the letters are inconsistent with the record as a whole and the relevant medical evidence, so they were properly accorded no weight. *Lewis*, 236 F.3d at 511-12. In addition, the letters are vague and unspecific, and have little bearing on the question of whether Plaintiff can perform basic work activities. *See* AR at 215, 216. Moreover, Ms. Swett failed to disclose in her letter that she is also Plaintiff's mother and landlord, AR at 126, 623, which demonstrates not only an alarming lack of candor but also a financial stake in Plaintiff continuing to receive disability benefits. Ms. Swett's lack of candor and her own financial interest in the outcome of this matter weakens her credibility. In sum, the ALJ properly accorded no weight to the two lay witness statements and his failure to give specific reasons for according no weight was harmless error.

///
///
///
///

## IX. CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's decision be AFFIRMED. A proposed Order accompanies this Report and Recommendation.

DATED this 17th day of November, 2009.

*James P. Donohue*
JAMES P. DONOHUE
United States Magistrate Judge